# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROY E. WEDLOW,**

        **Plaintiff,**

      **v.**                                **Case No. 15-C-1385**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff Roy Wedlow applied for social security disability benefits, but the Administrative Law Judge ("ALJ") assigned to the case concluded that despite his impairments plaintiff retained the capacity for sedentary work. Plaintiff now seeks judicial review. 42 U.S.C. §§ 405(g) & 1383(c). For the reasons that follow, I affirm the ALJ's decision.

## I. FACTS AND BACKGROUND

### A.  Summary of the Case

Forty-six years old at the time of his hearing before the ALJ, plaintiff alleged that he became disabled from work as of September 15, 2011, due to back and leg pain, arthritis in the hands, gout, sleep apnea, and obesity. He reported past employment as a delivery driver from 1995 to 2008 and as a sanitation worker from April to August 2011, both physically demanding jobs. He supported his application with a report from Dr. Ian Gilson, his primary physician, endorsing severe limitations in plaintiff's ability to stand, walk, sit, and lift, such that he could not maintain any full-time employment. The ALJ concluded that while plaintiff's impairments prevented him from performing his past work, he could, contrary to Dr. Gilson's

assessment, perform less demanding jobs.  I first summarize the medical evidence in the record, then the administrative proceedings before the agency, before turning to plaintiff's specific assignments of error.

**B.  Medical Evidence**

On July 1, 2011, plaintiff saw a nurse at Milwaukee Health Services, complaining of pain to the entire body.  He indicated that he had gone to the hospital and was told he could possibly have rheumatoid arthritis.[1]  He stated that he had to take Ibuprofen to take some of the pain away.  (Tr. at 282.)

On October 4, 2011, plaintiff saw Mark Behar, PA-C, at Milwaukee Health Services, complaining of pain in his hands, joints, low back, and right great toe; left arm weakness; muscle burning; skin dryness; and difficulty sleeping.  Because he was uninsured, he could not afford to see specialists to further evaluate possible obstructive sleep apnea and scalp keloids.[2] He also reported lower extremity edema, as well as a weight gain of 12 pounds in the last few months, requesting a referral to a nutritionist.  (Tr. at 278.)  On exam, he was non-tender to palpation aside from the bilateral calves.  He did have an exquisitely tender right great toe and edema of the bilateral lower extremities.  PA Behar attributed the toe pain to gout, prescribing Indocin.[3] He further assessed insomnia, probably secondary to obstructive sleep apnea.  For

---

[1]An ANA ("anti-nuclear antibody") test completed on July 1, 2011, was negative.  (Tr. at 286.)  A positive result on such a test is suggestive of rheumatoid arthritis.  <u>See</u> http://www.webmd.com/arthritis/antinuclear-antibodies-ana?page=2.

[2]Keloids are a type of scar tissue, frequently tender and painful.  <u>Stedman's Medical Dictionary</u> 943 (27th ed. 2000).

[3]Indocin, a non-steroidal anti-inflammatory drug ("NSAID"), is used to relieve pain, swelling, and joint stiffness caused by arthritis, gout, bursitis, and tendonitis. http://www.webmd.com/drugs/2/drug-9252-5186/indocin-oral/indomethacin---oral/details.

2

lower extremity edema, he prescribed Lasix.[2]  And for weight gain and obesity, he referred plaintiff to a nutritionist.[3]  Plaintiff had discontinued his previous prescription for Naprosyn because he could not afford it.[4]  (Tr. at 279.)

On November 13, 2011, plaintiff went to the emergency department at Froedtert Hospital in Milwaukee with shortness of breath, fatigue, and swelling in the right leg.  He also reported waking at night with rapid heart beat and back pain.  (Tr. at 390.)  On exam, he displayed normal heart sounds, normal breath sounds, normal range of motion, and normal gait.  (Tr. at 392.)  Doctors found his symptoms likely due to sleep apnea.  However, he could not get a sleep study due to lack of insurance.  It was recommended he contact his primary doctor.  (Tr. at 393.)  Doctors diagnosed shortness of breath and back pain, providing Vicodin.  (Tr. at 410.)

On January 13, 2012, plaintiff saw Dr. Gilson to establish care.  (Tr. at 309-10.)  He complained of gout, with active flare in the right foot.  He reported gaining 70 pounds in 2011 and found it hard to exercise because of joint and back pain.  He also reported dyspnea with exertion.  He further reported sleep apnea but had not undergone a sleep study because he could not afford it.  He also reported arthritis in the hands, hips, ankles, toes, and left shoulder, and complained of low back and bilateral leg pain when he walked, put on socks, and lied

---

[2]Lasix is a water pill used to treat fluid retention (edema). https://www.drugs.com/lasix.html.

[3]Plaintiff saw a nutritionist on October 18, 2011.  (Tr. at 277.)

[4]Naprosyn, an NSAID, is used to treat pain or inflammation caused by conditions such as rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, tendinitis, bursitis, gout, or menstrual cramps.  https://www.drugs.com/naprosyn.html.

3

supine. (Tr. at 310.)  He stood 5'6-½" and weighed 331 pounds, for a BMI of 52.6.[5]  (Tr. at 311-12.)  On exam, Dr. Gilson noted bilateral pre-tibial edema; tenderness to palpation of the bilateral PIPs and DIPs of both hands;[6] and tenderness to palpation of the right 1st MTP without erythema or swelling.[7]  Plaintiff was able to flex the lumber spine without pain in the back and legs, and his gait and coordination were intact.  He had multiple keloids on the scalp.  (Tr. at 312.)  Dr. Gilson assessed spinal stenosis, lumbar region, with neurogenic claudication, questionable in view of the inability to induce pain with retroflexion.[8]  It was unclear if plaintiff actually had gout.  Plaintiff's hypertension was controlled.  Dr. Gilson also suspected sleep apnea based on the observations of a relative and daytime drowsiness.  He assessed psoriasis, likely the cause of plaintiff's scalp lesions.  He instructed plaintiff to resume Amlodipine, a blood pressure medication;[9] Furosemide, a water pill;[10] and Indomethacin (Indocin); to continue Allopurinol, used to treat gout;[11] and to undergo a sleep study and lumbar

---

[5]Body mass index ("BMI") is a measure of body fat based on height and weight that applies to adult men and women.   A score of 30 or more equals obesity, 40 or more extreme obesity.  http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[6]The proximal interphalangeal joints ("PIP") lie between the first and second phalanges, the distal interphalangeal joints ("DIP") between the second and third phalanges. https://en.wikipedia.org/wiki/Interphalangeal_joints_of_the_hand.

[7]The metatarsophalangeal joints are the joints between the metatarsal bones of the foot and the proximal bones of the toes.  https://en.wikipedia.org/wiki/Metatarsophalangeal_joints.

[8]Neurogenic claudication is a common symptom of lumbar spinal stenosis or inflammation of the nerves emanating from the spinal cord. https://en.wikipedia.org/wiki/Neurogenic_claudication.

[9]https://www.drugs.com/amlodipine.html.

[10]https://www.drugs.com/furosemide.html.

[11]https://www.drugs.com/allopurinol.html.

4

MRI.  He also made dermatology and rheumatology referrals, and advised plaintiff to try to exercise as best he could.  (Tr. at 314-15.)

On January 16, 2012, plaintiff underwent a sleep study (Tr. at 426), which revealed moderate obstructive sleep apnea that had a positional component, with CPAP titration unsuccessful due to prolonged awakening.[12]  He was to return to the sleep lab for CPAP titration after a period of habituation and desensitization to the mask and CPAP treatment.  (Tr. at 459.)  A January 18, 2012, lumbar MRI showed enlarged vessels in the ventral epidural space, diffuse canal narrowing with mild epidural lipomatosis,[13] and mild degenerative disc disease at L4-L5.  (Tr. at 334.)

On January 27, 2012, plaintiff returned to Dr. Gilson, complaining of low back pain radiating to the legs, which limited ambulation.  He also reported gout, which had flared four times in the last two weeks, for which he was on Allopurinol.  (Tr. at 307.)  Dr. Gilson also noted hypertension, controlled on medication; obesity; edema; and sleep apnea diagnosed on polysomnogram.  Plaintiff could not sleep with the CPAP on; he was told to get used to it then return for titration.  He had not yet been seen by a rheumatologist regarding polyarthritis.  (Tr. at 308.)  Dr. Gilson assessed hypertension, controlled; sleep apnea; gout; back pain, cause

_____

[12]CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open.  CPAP typically is used by people who have breathing problems, such as sleep apnea.  CPAP treatment involves a CPAP machine, which has three main parts: a mask or other device that fits over the nose or nose and mouth; a tube that connects the mask to the machine's motor; and a motor that blows air into the tube.  https://www.nhlbi.nih.gov/health/health-topics/topics/cpap.

[13]Spinal epidural lipomatosis is most commonly observed in patients receiving long-term exogenous steroid therapy, but it can also be seen in patients with obesity.  With this condition, there is hypertrophy of the epidural adipose tissue, causing a narrowing of the spinal canal and compression of neural structures.  http://www.medscape.com/viewarticle/474908.

5

unclear; and dyspnea on exertion related to obesity. He increased Allopurinol, told plaintiff to take Ibuprofen for gout or low back pain, advised use of the CPAP machine for habituation then a return to the sleep lab for titration, and made a rheumatology referral. (Tr. at 309.)

On February 3, 2012, plaintiff saw Kathryn Kiehn, M.D., at the request of Dr. Gilson, for evaluation of joint pains. Plaintiff reported being diagnosed with gout in 2007, which resolved after three weeks, then returned in 2009, constant since then. He was taking Allopurinol and Indomethacin. Plaintiff also reported more diffuse pains since April 2010 in his hands, wrists, shoulders, hips, and back. He also reported a burning type pain in the muscles at times, but no weakness. The back pain was in the low back, worse with standing and walking and better with sitting or bending over. He had gained a substantial amount of weight because of inactivity due to his pain levels. He also likely had psoriasis and was scheduled to see dermatology on February 7. (Tr. at 303.) On exam, plaintiff had multiple keloids on the scalp. On musculoskeletal exam, he had normal range of motion, no swelling, no redness, and no tenderness except for tenderness to palpation of multiple joints without synovitis noted. He had no localized SI joint pain but rather diffuse lower back pain to palpation. (Tr. at 305.) Dr. Kiehn was uncertain of the gout diagnosis, as there was not really a flare like description but more constant pain. Dr. Kiehn ordered hand, feet, and hip x-rays, and continued Allopurinol. (Tr. at 307.) X-rays taken on February 7, 2012, showed bilateral flat feet, right first metatarsophalangeal narrowing with dorsal osteophyte formation, minimal distal interphalangeal osteoarthritis in the hands, and normal hips. (Tr. at 337.)

On February 7, 2012, plaintiff saw Helen Kuzma, PA-C, for scalp rash and hair loss. (Tr.

6

at 300.)  PA Kuzma assessed infected keloidal papules, starting Keflex.[14]  (Tr. at 302.)

On February 10, 2012, plaintiff returned to Dr. Kiehn, who reviewed the radiology reports of plaintiff's feet, hands, and hips, with no inflammatory findings identified.  An MRI of the lumbar spine showed enlarged vessels in the ventral epidural space of the lumbar spine contributing to compression of the thecal sac.  (Tr. at 298.)  Dr. Kiehn suggested a neurosurgery or orthopedic evaluation given plaintiff's description of spinal stenosis type symptoms.  He was to call with any acute joint flares and in the meantime stay on Allopurinol. (Tr. at 299.)

On February 16, 2012, plaintiff saw Dennis Maiman, M.D., Ph.D., for evaluation of his ongoing back and leg pain.  Plaintiff reported the pain had a dramatic effect on his life. However, he denied any motor weakness, bowel or bladder complaints.  He had recently started stretching exercises, which had improved him significantly.  His health history was significant for morbid obesity, sleep apnea, hypothyroidism, and hypertension. On exam, his gait was mildly antalgic, lumbar range of motion decreased in flexion and extension with severe paravertebral spasm, straight leg raise was negative bilaterally, motor examination was unremarkable, and sensory exam revealed decreased touch in the L5 and S1 distribution on the right.  An MRI scan showed a considerable degree of epidural lipomatosis, but in addition some congenital stenosis and degenerative changes.  It also showed an unusual collection of vessels behind L5, which could be an "AVM."[15]  However, Dr. Maiman did not think it worth

---

[14]Keflex is used to treat infections caused by bacteria, including skin infections. https://www.drugs.com/keflex.html.

[15]An AVM ("arteriovenous malformation") is an abnormal, snarled tangle of blood vessels causing irregular connections between the arteries and veins.  These malformations most often occur in the spinal cord and in any part of the brain or on its surface, but can develop

exploring at the time.  Rather, he believed that plaintiff's symptomatology predominantly related to epidural lipomatosis.  He advised plaintiff "in the strongest terms possible that he needs to lose a considerable amount of weight and start a rehabilitation program." (Tr. at 295.)  Plaintiff was to go to physical therapy and work on weight reduction, following up in three months.  (Tr. at 295.)  Dr. Maiman advised him to "maintain or resume normal activities ASAP" and "advised against bedrest."  (Tr. at 296.)

On February 17, 2012, plaintiff returned to Dr. Gilson, indicating that he had a CPAP for two days but felt the same.  He had seen a rheumatologist and possibly had gout, unlikely psoriatic arthritis.  Hand films showed mild osteoarthritis.  He had also seen Dr. Maiman, who recommended more physical therapy and weight loss.  Plaintiff reported his low back pain was so severe he could barely stand it, rating the pain at over 10.  He was unable to do daily chores and found it hard to dress.  In the past, he had no benefit from Oxycodone or Vicodin.  Dr. Gilson assessed severe chronic low back pain – candidate for opiate therapy, probable gout, sleep apnea, and hypertension – well controlled.  (Tr. at 297.)

On February 28, 2012, plaintiff saw Anne Kennedy for a physical therapy evaluation, on referral from Dr. Maiman.  He complained of back pain with some radiation into the right lateral thigh.  He occasionally had some weakness/pain in the left hip but mainly pain in the right thigh.  He also reported gaining a significant amount of weight since September 2011.  He reported that the pain significantly worsened since September 2011.  He rated the pain 5/10 at best, 10/10 at worst.  The pain was daily, continuous.  He reported that he could stand for just five minutes, walk 1/4 block; he also reported difficulty dressing in the morning.  The pain eased

---

elsewhere in the body.  http://www.ninds.nih.gov/disorders/avms/detail_avms.htm.

8

with sitting or lying down. (Tr. at 316.) He reported moderate impairment with bathing/dressing, lifting, and stairs, and severe impairment with standing and walking. On observation, he had mild difficulty transitioning from sitting to standing and mildly antagic gait. His displayed some tenderness to palpation in the lumbar area. (Tr. at 317.) Straight leg raise testing was negative bilaterally. He was to return twice per week for the next six weeks. (Tr. at 318.)

On March 8, 2012, plaintiff saw Julie Wain for physical therapy, arriving five minutes late. He rated the pain in his low back as 10/10. His gait was antalgic with limping on the right. He reported standing and walking tolerance at five minutes maximum. He reported falling two weeks ago, which he forgot to tell the therapist last time. He asked about a cane for ambulation secondary to leg pain. (Tr. at 315.)

The record does not include subsequent physical therapy notes or other records from treating providers. Rather, the balance of the medical evidence consists of emergency room records and Dr. Gilson's report dated March 2014.

On June 28, 2013, defendant went to the emergency room of a Gary, Indiana hospital, having recently moved from Wisconsin, with right flank pain radiating to the abdomen. (Tr. at 467-69, 473.) He reported he never had this kind of pain before. (Tr. at 469.) On exam, he had normal range of motion. (Tr. at 470.) Plaintiff used a cane to ambulate, was independent with activities of daily living, but needed some assistance with the lower body. (Tr. at 480.) Doctors suspected a kidney stone, but a CT scan of the abdomen was unremarkable except for a small hiatal hernia. (Tr. at 476, 489.) Labs were all reassuring. Plaintiff was admitted for observation and pain control (Tr. at 471), doing well and discharging home on June 30, 2013 in stable condition (Tr. at 479, 485).

9

On September 19, 2013, plaintiff went to the emergency department at Froedtert Hospital in Milwaukee, complaining of headache and tooth pain. (Tr. at 829, 834.) Musculoskeletal and neurological exams were normal. He was given a dental block injection (Tr. at 837) and discharged home on September 20, 2013 (Tr. at 840).

On January 31, 2014, plaintiff went to the emergency department at Froedtert, complaining of back pain and racing heart. (Tr. at 787, 792.) He denied numbness, tingling, or loss of bladder function, but indicated he felt weaker due to the pain. He took Vicodin with no relief. He reported moving the previous day, which involved bending over and packing things. He also stated he ran out of Vicodin yesterday. (Tr. at 792.) On exam, he had normal range of motion, normal gait, normal strength, and normal sensation to light touch. (Tr. at 795.) Given the reassuring exam, doctors did not feel emergency MRI or CT scans were warranted. His pain was likely made worse from lifting boxes and running out of narcotics. His pain was controlled with IV dilaudid. (Tr. at 795.) He ambulated out of the emergency department in stable condition (Tr. at 796) with a prescription for Oxycodone (Tr. at 799).

The following day, plaintiff returned to the emergency department at Froedtert, complaining of back pain. (Tr. at 768.) He had been given Oxycodone for pain management the previous day but did not get it filled because it was "not free." (Tr. at 770.) He reported that he had been packing and moving boxes this week but denied any injury. (Tr. at 775.) On exam, he was able to raise both legs off the bed without increased back pain. He also displayed normal sensation to touch in both legs. His gait was normal. (Tr. at 773.) He received two doses of dilaudid with relief of some of the pain. The doctors believed the paresthesias he was having in both legs were not related to central spinal compression, as he

10

had full strength and could differentiate soft touch from sharp touch.[16] He was discharged home in stable condition and would get the Oxycodone prescription filled. (Tr. at 773.) He was advised to avoid lifting above 10 pounds, twisting, and prolonged sitting. (Tr. at 776.)

On February 16, 2014, plaintiff again went to the emergency department at Froedtert, this time complaining of chest tightness, shortness of breath, and vertigo. (Tr. at 546, 548.) He reported that he was not using his sleep apnea machine, but this did not feel like his typical sleep apnea awakenings. He was able to get up and walk to the bathroom and his vertigo improved, but the shortness of breath and chest tightness persisted. (Tr. at 548.) Defendant was pain free after nitro but was admitted for a cardiac work-up (Tr. at 552), which ruled out acute coronary syndrome (Tr. at 556). He was discharged on February 18, 2014, with diagnoses of obstructive sleep apnea, bronchospasm, and drug-induced atrial fibrillation, resolved, and recommendations of weight loss and appropriate treatment of sleep apnea. (Tr. at 556.) He was told to resume medications, use the CPAP machine every night, and use the pool for exercise and work on weight loss. (Tr. at 557.)

On March 14, 2014, Dr. Gilson completed a medical assessment report, listing diagnoses of spinal stenosis, epidural lipomatosis, and polyarthritis, with a guarded prognosis. (Tr. at 539.) Dr. Gilson listed symptoms of chronic pain, chronic fatigue, and paresthesia, which were severe enough to interfere with the attention and concentration necessary to perform simple work tasks. Plaintiff took Ibuprofen and Oxycodone, which produced no medication side effects. Dr. Gilson opined that plaintiff could continuously stand for 0.1 hours,

---

[16]Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching. http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm.

11

walk minimally, and sit for 0.5 hours; in an eight-hour workday, plaintiff could stand 0.1 hours, walk 0.1 hours, and sit for three hours.  (Tr. at 539.)  Dr. Gilson further opined that plaintiff could not get through an eight-hour workday without lying down; that he could never lift and carry any amount of weight; that his ability to use his hands and feet was limited due to a weak grip, hand pain, and foot pain; and that he could never work above the shoulder, bend at the waist, twist/turn, squat, or climb.  Finally, Dr. Gilson opined that plaintiff would miss three or more days per month due to his impairments.  (Tr. at 540.)

**C.    Administrative Proceedings**

> **1.    Plaintiff's Application and Supporting Materials**

On February 23, 2012, plaintiff applied for supplemental security income and disability insurance benefits, alleging a disability onset date of September 15, 2011.  (Tr. at 198, 207.) In his disability report, plaintiff alleged that he could not work due to back pain, right leg/hip numbness/pain, arthritis in the hands, gout, and sleep apnea.  (Tr. at 231.)  He reported standing 5'6" tall and weighing 317 pounds.  (Tr. at 231.)  Plaintiff indicated that he last worked August 23, 2011, when he was laid off.  (Tr. at 231.)  He reported working for DHL Express from 1995 to 2008, and for the City of Milwaukee sanitation department from April 1, 2011 to August 23, 2011.  (Tr. at 232.)

In a function report, plaintiff indicated that his condition limited his ability to lead a normal life.  Back pain prevented him from doing most normal movements and chores.  (Tr. at 241.) He reported that he could stand for just five minutes at a time and would need to go to school to learn a job that would allow him to sit all day or work from home.  (Tr. at 241-42.)  He further reported minimal daily activities and difficulty dressing, bathing, and using the toilet.  (Tr. at

243.)  He reported making simple meals because he could not stand for long.  The pain made household chores difficult and prevented any outside work.  (Tr. at 244.)  Someone else usually shopped for him.  (Tr. at 245.)  He reported hobbies of reading and watching TV.  He talked on the phone with friends daily and tried to go to church once per week.  (Tr. at 246.)  He estimated that he could lift "not much at all," walk less than 40 feet, and stand no more than five minutes.  (Tr. at 247.)  In a physical activities addendum, plaintiff indicated that he could continuously sit for two hours, stand for five minutes, and walk for three to five minutes; during an eight hour day, he could sit for two hours or more, stand for five minutes, and walk for three to five minutes.  (Tr. at 250.)

The Social Security Administration denied plaintiff's applications initially on March 26, 2012 (Tr. at 94-95, 135), relying on the assessment of agency reviewing physician Syd Foster, M.D., who opined that plaintiff could perform sedentary work (lifting up to 10 pounds, standing about two hours per workday, and sitting about six hours per workday), with occasional balancing, stooping, and crouching, and fingering and handling limited to frequent but not constant (Tr. at 101-02, 110-11).  Plaintiff requested reconsideration, but on August 1, 2012, the agency maintained the denial (Tr. at 114-15, 140), this time relying on the assessment of George Walcott, M.D., that plaintiff could perform sedentary work with no additional postural, manipulative, or other limitations (Tr. at  121-22, 130-31).   Plaintiff then requested a hearing before an ALJ.  (Tr. at 158.)

###    2.    Hearing

On March 31, 2014, plaintiff appeared with counsel for his hearing before the ALJ.  (Tr. at 48.)  The ALJ also summoned a vocational expert ("VE") to the hearing.

13

### a.    Plaintiff

Plaintiff testified that he was 46 years old, with a 12th grade education.  (Tr. at 51.)  He stood 5'6" tall and weighed 355 pounds, up about 100 pounds over the last couple years.  (Tr. at 52.)  He testified that he last worked in August 2011 and alleged a disability onset date of September 15, 2011.  (Tr. at 52.)  He indicated that on the onset date he was laying down, went to get up, and felt horrible pain in his back and left side of his body, such that he had to roll out of bed.  (Tr. at 52-53.)

Plaintiff related past employment as a courier, delivering packages weighing up to 100 pounds, and as a seasonal sanitation worker, which also required heavy lifting.  (Tr. at 53-54.)  He stopped working as a courier in 2008 when he and 90% of his co-workers were laid off.  (Tr. at 76.)  For about five months in 2011 he worked for the city sanitation department (Tr. at 76-77); that job ended because it was seasonal (Tr. at 77-78).  He collected unemployment in late 2011 and through 2012.  (Tr. at 78.)

Plaintiff testified to a variety of medical conditions limiting his ability to work.  (Tr. at 54.)  He related cellulitis on his scalp, which caused itching, bleeding, and headaches.  (Tr. at 54-55.)  He also related a problem with his left shoulder, his dominant side, limiting his ability to reach or lift overhead.  (Tr. at 56.)  He had also been diagnosed with an AVM in the lumbar region, which limited his activities.  (Tr. at 57.)  He always had back pain, which he rated at 7 on a 0-10 scale on a good day, 10 on a bad day.  The pain radiated from his low back to his hips and legs.  (Tr. at 58.)  The back pain caused urinary incontinence.  He also related urinating no less than 15 times throughout the night, from 12:00 to 6:00 in the morning.  (Tr. at 59.) Plaintiff further related edema in the legs, for which he took water pills.  (Tr. at 60.)  His feet also swelled, even with the pills.  (Tr, at 60-61.)  He also had gout, which manifested in his

14

right big toe, causing horrible pain.  (Tr. at 61.)  He testified that the gout caused daily pain, with flare-ups four to five times per month, lasting from one to three days, where he could not even put a sheet on his foot.  (Tr. at 61-62.)  He took medication, which relieved the pain a little bit. (Tr. at 62.)

Plaintiff testified that he got little sleep at night, about three hours, waking frequently due to pain or the need to urinate.  (Tr. at 62, 84.)  He used a CPAP machine for sleep apnea, which did not help much.  (Tr. at 63.)  He often slept sitting up and never felt refreshed in the morning.  (Tr. at 64-65.)  He fell asleep two to three times per day if sitting.  (Tr. at 65.)  On a typical day, he laid down for about three hours due to pain, fatigue, and shortness of breath. (Tr. at 66.)  He slept about three hours during the day.  (Tr. at 84-85.)

Plaintiff testified that he currently lived with a friend, previously with his brother, due to lack of income.  (Tr. at 66-67.)  His friend did the chores around the house.  Plaintiff shopped every once in awhile, using a motorized cart.  (Tr. at 67.)  He was able to make a simple meal, like a sandwich, but he did not help much at all around the house.  Plaintiff testified that he did not drive due to pain in his hands and trouble getting into a vehicle.  (Tr. at 68.)  He had used a cane for two years.  (Tr. at 69.)  Plaintiff testified to increased trouble breathing in cold weather.  (Tr. at 69.)[17]  He also had a spur on his left heel, as well as a plantar fascia tear.  (Tr. at 70.)

Plaintiff explained that he did not have surgery on his back due to a risk of paralysis and hemorrhaging related by Dr. Maiman.  Plaintiff testified that Dr. Maiman told him "you'll never be able to work a day in your life again."  (Tr. at 71.)

---

[17]At this point of the hearing, plaintiff asked for a moment to adjust himself.  (Tr. at 70.)

Plaintiff indicated that, in a month, he would have ten days where he did not leave the house because of his conditions. Otherwise, he could leave the house for doctor's appointments, shopping, or church. He denied social activities like movies. (Tr. at 72.) He related trouble breathing when walking even short distances. (Tr. at 73.)

Plaintiff testified that his only sources of income was IDAP, a county assistance program.[18] (Tr. at 74.) He identified Dr. Gilson as his regular doctor, seeing him since 2011. (Tr. at 80.) The ALJ noted the lack of recent treatment records in the file, aside from emergency room visits. (Tr. at 80-81.) Plaintiff explained he did not have any insurance. (Tr. at 81-82.) He did continue to take a variety of medications: several for blood pressure, two for gout, two narcotics for pain, cream for cellulitis, and an inhaler. (Tr. at 89.)

**b. VE**

The VE classified plaintiff's past work as a delivery driver as semi-skilled, medium work, and as a sanitation worker as unskilled, very heavy work. (Tr. at 91.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work allowing for the opportunity to change positions from sitting to standing for a few minutes at a time in addition to usual breaks. (Tr. at 91.) The VE testified that such a person could work as a charge account clerk, order clerk, credit checker, surveillance system monitor, inspector/tester, or production worker/assembler. (Tr. at 91-92.)

———————————

[18]The Interim Disability Assistance Program ("IDAP") is a county-funded program that provides a monthly payment to financially needy residents who are unable to work due to a disability and have a high probability of receiving SSI. The payment is issued until SSI eligibility is approved or denied, after which the IDAP payment ends. IDAP is not an entitlement benefit but an interest-free loan, and IDAP recipients must sign a contract to repay. If SSI is approved, repayment is deducted from the initial SSI lump sum payment. If SSI is denied, eligibility ends and the individual is expected to repay from any future income or non-exempt assets, or from their estate upon death. http://county.milwaukee.gov/InterimDisabilityAss9971.htm.

16

If the person were limited in the manner described in plaintiff's testimony, no jobs could be done.  The VE specifically noted plaintiff's statements that he needed to lie down three hours per day, and that he did not leave the house due to pain ten days per month.  (Tr. at 92.)  Employers of these types of jobs would tolerate just one absence per month and no more than 10% off task or off production.  (Tr. at 92.)

### 3. ALJ's Decision

On August 1, 2014, the ALJ issued an unfavorable decision.  (Tr. at 30.)  Following the familiar five-step evaluation process,[19] at step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since September 15, 2011, the alleged disability onset date.  (Tr. at 35.)

At step two, the ALJ determined that plaintiff suffered from the severe impairments of lumbar degenerative disc disease and obesity.  (Tr. at 35.)  In elaborating on this finding, the ALJ noted that the medical professionals had offered a variety of diagnostic descriptions of plaintiff's back impairment, and the ALJ's finding of severe degenerative disc disease was meant to encompass those various diagnoses.  (Tr. at 35-36.)  Regarding obesity, the ALJ noted that at the time he filed his application plaintiff reported that he weighed 317 pounds at a height of 5'6".  The ALJ found that plaintiff's obesity had more than a minimal effect on his ability to do work-related activities, thus qualifying as severe, but noted that the objective

---

[19]Under this test, the ALJ determines: (1) whether the claimant is currently working; (2) if not, whether he suffers from severe, medically determinable impairments; (3) if so, whether the claimant's impairments meet or medically equal the requirements of an impairment listed in the regulations as conclusively disabling; (4) if not, whether the claimant has the residual functional capacity ("RFC") to return to his past relevant work; and (5) if not, whether he can make an adjustment to other work in the national economy.  See, e.g., Varga v. Colvin, 794 F.3d 809, 812 n.2 (7th Cir. 2015).

17

medical findings, including observations by multiple medical providers, indicated that plaintiff was capable of moving about and performing significant activities of daily living, as well as work-related activities at the functional level set forth in the decision. (Tr. at 36.)

The ALJ acknowledged plaintiff's reports of pain in the upper extremities. In February 2012, plaintiff saw Dr. Kiehn regarding his hand issues; on examination, he had normal range of motion of the hands, wrists, elbows, and shoulders; he did display tenderness to palpation of multiple joints but without synovitis, swelling, or warmth. X-rays of the hands taken later that month were mostly unremarkable. Based on the objective medical findings, the relatively mild abnormalities noted by Dr. Kiehn, and plaintiff's subsequent need for at most minimal treatment, the ALJ found plaintiff's upper extremity impairments non-severe. (Tr. at 36.)

The ALJ also acknowledged that plaintiff suffered from gout, for which he also saw Dr. Kiehn. Again, however, while plaintiff displayed tenderness to palpation, his range of motion was normal, and x-rays showed mild findings. (Tr. at 36.) Based on this evidence, the ALJ found plaintiff's gout non-severe. (Tr. at 36-37.)

The ALJ further acknowledged possible respiratory and cardiovascular impairments. A January 2011 polysomnogram showed moderate obstructive sleep apnea, and CPAP titration was unsuccessful due to prolonged awakening. As of October 2011, plaintiff was unable to afford further evaluation of his sleep apnea. The ALJ concluded that while plaintiff suffered from sleep apnea, "examiners did not observe associated symptoms that would limit [plaintiff's] ability to perform work-related functions." (Tr. at 37.) In February 2014, plaintiff sought emergency treatment for chest tightness, shortness of breath, and vertigo, for which he was admitted for two days. However, testing ruled out acute coronary syndrome, his symptoms resolved with treatment, and he discharged with diagnoses of obstructive sleep apnea,

18

bronchospasm, and resolved drug-induced atrial fibrillation. Considering this evidence, the ALJ found plaintiff's respiratory and cardiovascular impairments non-severe. (Tr. at 37.)

At step three, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any listed impairment. (Tr. at 37-38.) He accordingly moved to step four, first determining that plaintiff retained the RFC to perform the full range of sedentary work. (Tr. at 38.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 38.)

Regarding plaintiff's symptoms, the ALJ noted the two-step process set forth in SSR 96-7p, which requires the adjudicator to first determine whether the claimant suffers from an underlying impairment that could reasonably produce the symptoms alleged. Second, if such an impairment is shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's functioning. At this step, if the claimant's statements are not substantiated by objective medical evidence, the adjudicator must make a credibility finding based on the entire case record.[20] (Tr. at 38.)

The ALJ noted plaintiff's claims that his conditions affected his ability to care for his personal needs, including bathing, shopping, and performing household chores. Plaintiff further alleged that his conditions affected his ability to lift, stand, walk, sit, squat, bend, kneel, climb stairs, remember, complete tasks, and concentrate. Regarding his specific work-related abilities, plaintiff claimed that he could sit for only two hours per day, stand for only five minutes

---

[20]Recently, the Social Security Administration rescinded and replaced SSR 96-7p with SSR 16-3p. The new Ruling eliminates the use of the term "credibility" and clarifies that subjective symptom evaluation is not an examination of an individual's character. 2016 SSR LEXIS 4, at *1. However, the new Ruling otherwise maintains the same two-step symptom evaluation process used by the ALJ here. See id. at *5.

19

per day, and walk for only three to five minutes per day. (Tr. at 38.) The ALJ concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. at 38-39.)

In support of this conclusion, the ALJ first stated that the medical record did not support plaintiff's allegations of disabling physical symptoms. For instance, in October 2011, one month after the alleged disability onset, plaintiff saw PA Behar, complaining of massive pain throughout his body. However, on exam, he was non-tender to palpation with the exception of his bilateral calves. In November 2011, he presented to the emergency room with complaints of back pain, but on exam he had normal range of motion and normal gait. He reported increased swelling in his right leg, but there was no visible edema on examination. (Tr. at 39.) In January 2012, plaintiff saw Dr. Gilson with complaints of back and leg pain, but on exam he was able to flex his lumbar spine without pain in his back or legs and retained intact gait and coordination. An MRI of the lumbar spine performed later that month showed enlarged vessels predominantly in the ventral epidural space of the lumbar spine contributing to compression of the thecal sac, as well as diffuse developmental canal narrowing, mild degenerative disc disease at L4-L5, and no abnormal signal in the distal cord. The ALJ found these objective MRI findings consistent with plaintiff's medically determinable degenerative disc disease, but "they are not consistent with [plaintiff's] subjective allegations of disabling symptoms associated with the condition. [Plaintiff's] intact gait, intact coordination and retained range of motion around that time were consistent with the ability to sustain sedentary exertional work." (Tr. at 39.)

20

The ALJ further noted that February 2012 hip x-rays were normal. Around the same time, plaintiff saw Dr. Maiman, who noted mildly antalgic gait and decreased lumbar range of motion but unremarkable motor examination. Dr. Maiman strongly recommended that plaintiff lose a considerable amount of weight and start a rehabilitation program. He also advised plaintiff to maintain or resume normal activities and advised against bed rest. The ALJ stated: "While [plaintiff's] mildly antalgic gait and decreased lumbar range of motion support some limitations, Dr. Maiman's recommendations that [plaintiff] lose weight, start a rehabilitation program and resume normal activities suggest that [plaintiff] was nonetheless still able to perform at least sedentary exertional work." (Tr. at 39.)

The ALJ further noted that later that month plaintiff saw physical therapist Kennedy for an evaluation, complaining of back pain with radiation into his lower extremities. (Tr. at 39.) However, on examination he had only mild difficulty transitioning from sitting to standing and mildly antalgic gait. (Tr. at 39-40.) He had pain with lumbar range of motion testing, but straight leg raises were negative bilaterally. (Tr. at 40.)

In June of 2013, plaintiff was admitted to the hospital after presenting with intractable back pain. On exam, he had normal range of motion. He used a cane to ambulate, but the ALJ stated that the observations of other examiners suggested that a cane was not medically necessary; he often exhibited a normal gait and other examiners recommended he increase his activity level. Plaintiff received a discharge diagnosis of urinary tract infection, hypertension, back pain, extreme obesity, and hematuria. (Tr. at 40.)

In January 2014, plaintiff presented at the emergency room with complaints of back pain after bending over and packing boxes for a move. On exam, he had normal gait, normal coordination, and normal reflexes. He retained 5/5 strength with normal sensation to light

touch. The examiner determined that an emergency MRI or CT scan was not warranted, concluding that moving boxes the previous day and running out of medication likely caused plaintiff's worsening pain. Plaintiff returned to the ER the following day with similar symptoms. On exam, he had normal range of motion, was able to raise both legs off the bed without increased pain, and retained normal gait. The ALJ stated: "[Plaintiff's] normal gait even when experiencing increased symptoms is added evidence that he can sustain the standing and walking required of sedentary exertional work. Moreover, [plaintiff's] ability to move boxes further suggests that his symptoms are not as limiting as alleged." (Tr. at 40.)

Later in February 2014, plaintiff returned to the ER again, this time with complaints of chest tightness. On exam, he had normal range of motion with no edema or tenderness. The ALJ concluded: "Overall, the objective medical evidence, [plaintiff's] need for only conservative treatment and the relatively mild abnormalities revealed on physical examinations are consistent with the ability to perform the full range of sedentary exertional work." (Tr. at 40.)

The ALJ also considered plaintiff's daily activities. In March 2012, plaintiff reported problems managing his personal care; he was able to prepare himself basic meals, but his limited ability to stand affected him in this regard. He reported that his limited ability to stand also affected his ability to perform housework and prevented yard work. (Tr. at 40.) He further reported that he went out every day and could go out alone, but that he had trouble going to the store. He also noted going to church once per week. The ALJ found that plaintiff's limited activities appeared volitional, as he had only mild difficulty moving from sitting to standing and mildly antalgic gait on exam the previous month. "These observations are not consistent with [plaintiff's] reported limitations in activities of daily living." (Tr. at 41.) The ALJ further noted that in July 2013 it was noted that plaintiff was independent with activities of daily living,

22

although he needed some assistance with regard to his lower body. (Tr. at 41.)

The ALJ further noted that plaintiff sat throughout the entire hearing. "While he shifted around in his chair, his ability to sit through the hearing is added evidence that he does not require a sit-stand option, contrary to his allegation." (Tr. at 41.)

Finally, the ALJ considered plaintiff's testimony that one of his physicians told him he would not ever be able to work again. The ALJ concluded that, if a physician did make such a statement, it is likely the physician was telling plaintiff he could not perform his past work. In support, the ALJ cited plaintiff's report that he needed to go back to school and learn a job that would not require him to walk during the day. The ALJ agreed that plaintiff could no longer perform his past work, but the evidence did not support a claim that he could not perform any work. The ALJ noted that plaintiff actually stopped working previous jobs because his employer laid him off or because the work was seasonal, rather than because of his impairments. "Overall, [plaintiff's] level of treatment, the observations of examiners, the objective medical evidence, [plaintiff's] presentation during [the] hearing and [plaintiff's] activities of daily living suggest that he is capable of sustaining sedentary exertional work." (Tr. at 41.)

Turning to the opinion evidence, the ALJ gave great weight to the opinions of the state agency medical consultants, Drs. Foster and Walcott. At the initial review level, Dr. Foster opined that plaintiff could perform sedentary work but required a cane for ambulation. Dr. Foster further opined that plaintiff could occasionally stoop, balance, and crouch, and that he could perform frequent handling and fingering. At the reconsideration level, Dr. Walcott opined that plaintiff could perform the full range of sedentary work. The ALJ found Dr. Walcott's opinion consistent with plaintiff's conservative treatment, the relatively mild abnormalities noted by examiners, and the objective medical evidence. This evidence also supported Dr. Foster's

23

opinion that plaintiff could perform sedentary work. However, the ALJ found that the evidence reflected improvement in plaintiff's condition since Dr. Foster offered his opinions; the updated evidence showed that plaintiff did not have ongoing upper extremity symptoms, and the observations of examiners suggested that plaintiff did not require postural limitations. (Tr. at 41.) The ALJ acknowledged that plaintiff had some difficulty standing and waking, but he generally exhibited normal strength and coordination, and he was able to bend and move boxes in the process of moving. (Tr. at 41-42.)

The ALJ gave little weight to the March 2014 opinions of Dr. Gilson that plaintiff could never lift and could stand for only one-tenth of an hour, walk for one-tenth of an hour, and sit for only three hours per day. Dr. Gilson further opined that plaintiff could walk only minimally without a break; could sit for only half an hour at a time; had limitations with regard to simple grasping, fine manipulation, and operating of foot controls; and could never perform work above shoulder level, bend at the waist, twist, turn, squat, or climb. Finally, Dr. Gilson concluded that plaintiff could not get through an eight-hour workday on a sustained basis, and that he would miss three or more days of work per month. The ALJ noted that plaintiff saw Dr. Gilson in 2012 but did not follow up with Dr. Gilson. The ALJ also noted that Dr. Gilson referred to a diagnosis of spinal stenosis, but the MRI did not reveal spinal stenosis. The ALJ further found Dr. Gilson's opinions inconsistent with Dr. Gilson's own observations and findings and with the observations and findings of other examiners, and with plaintiff's conservative course of treatment. "Finally, the recommendations noted by other examiners that [plaintiff] should increase his activity level is added evidence that [plaintiff] retains greater abilities than those put forth by Dr. Gilson." (Tr. at 42.)

In sum, the ALJ found the sedentary RFC supported by plaintiff's level of treatment, the

24

observations of examiners, the objective medical evidence, plaintiff's presentation during the hearing, and plaintiff's activities of daily living. Based on this RFC, the ALJ determined at step four that plaintiff could not perform his past work as delivery driver, medium level work, or sanitation worker, very heavy work. (Tr. at 42.)

At step five, considering plaintiff's age, education, work experience, and RFC, the ALJ found that plaintiff could perform other jobs in the economy. Based on the RFC for a full range of sedentary work, Medical-Vocational Rules 201.28 and 201.21 directed a finding of not disabled. (Tr. at 43.) In the alternative, if plaintiff required a sit-stand option, there were still jobs he could do, as identified by the VE, including charge accounts clerk, order clerk, credit checker, surveillance system monitor, inspector/tester, and production worker. (Tr. at 43-44.) The ALJ accordingly found plaintiff not disabled. (Tr. at 44.)

Plaintiff requested review by the Appeals Council (Tr. at 23), but on September 21, 2015, the Council denied his request (Tr. at 1), making the ALJ's decision the final decision of the Commissioner. Loveless v. Colvin, 810 F.3d 502, 506 (7th Cir. 2016). This action followed.

## II. DISCUSSION

### A. Standard of Review

The court reviews an ALJ's decision to ensure that he applied the correct legal standards and supported his conclusions with "substantial evidence." See, e.g., Bates v. Colvin, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. Under this deferential standard, the court will not re-weigh the evidence or substitute its judgment for the ALJ's. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). In reaching his decision, the ALJ

25

must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.  Id.

**B.    Analysis**

Plaintiff argues that the ALJ erred by: (1) relying on the medical opinions of agency consultants that were not based on all relevant evidence, (2) failing to determine the effects of his sleep apnea, (3) rejecting Dr. Gilson's report, (4) finding that he could sit as required for sedentary work, and (5) finding his statements not entirely credible.  I address each contention in turn.

### 1.    Agency Consultant Medical Opinions

Plaintiff first contends that the ALJ erred in relying on the opinions of the agency consultants – Dr. Foster, who in March 2012 found plaintiff capable of sedentary work with certain postural and manipulative restrictions, and Dr. Walcott, who in August 2012 found plaintiff capable of the full range of sedentary work.  The ALJ gave great weight to the consultants' opinions that plaintiff could perform sedentary work, finding them consistent with plaintiff's conservative treatment, the relatively mild abnormalities noted by examiners, and the objective medical evidence.  However, the ALJ rejected Dr. Foster's postural and manipulative limitations based on the later evidence showing that plaintiff did not have ongoing upper extremity symptoms, and the observations of examiners suggesting that plaintiff did not require postural limitations.  (Tr. at 41.)

Plaintiff notes that these consultants never saw the subsequent medical records, including those relating to his treatment for back and supra-pubic pain in June 2013, his emergency room visits for back pain in late January/early February 2014, and his abnormal

26

cardiac tests in February 2014.  See Campbell v. Astrue, 627 F.3d 299, 309  (7th Cir. 2010) (reversing where ALJ relied on consultants who did not have the benefit of significant later treatment records); see also Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014) (reversing where ALJ failed to submit "new and potentially decisive" medical evidence to medical scrutiny); Harlin v. Astrue, 424 Fed. Appx. 564, 568 (7th Cir. 2011) ("To the extent that the ALJ projected how [the state agency psychologist] would have testified had she seen the additional documents, the ALJ improperly assumed the role of doctor.").

As the Commissioner notes, by their nature state agency consultant reports will be based on the medical evidence existing at the initial and reconsideration stages; if, as if usually the case, the claimant continues to receive treatment, these reports will be dated by the time the ALJ issues a decision.  The regulations nevertheless require the ALJ to consider them, see SSR 96-6p, 1996 SSR LEXIS 3 , at *4, and plaintiff cites no case holding that reliance on such opinions is always suspect due to timing alone.  See Lewis v. Colvin, No. 14-cv-854, 2015 U.S. Dist. LEXIS 83666, at *17 (S.D. Ind. June 29, 2015) ("Ms. Lewis cites no authority for her broad proposition that an ALJ cannot rely on a state agency consultant's report if there is medical evidence in the record which post-dates the report.").

In determining how much weight to give consultant opinions, the ALJ must consider the supportability of the opinion in the evidence, including any evidence received at the administrative law judge level that was not before the state agency.  SSR 96-6p, 1996 SSR LEXIS 3, at *6.  Plaintiff makes no claim that the ALJ failed to thoroughly review the subsequent medical evidence in this case.[21]    If the later evidence is, as in Goins, "new and

_____

[21]While the ALJ may not, as plaintiff notes in reply, make his own independent findings based on raw medical data, reviewing the evidence to determine credibility and weight is

27

potentially decisive," the ALJ may need to obtain a fresh medical opinion. The ALJ did not obtain an updated opinion in this case, but plaintiff fails to explain how the evidence he cites meets the <u>Goins</u> standard. Plaintiff received minimal treatment after Dr. Walcott issued his report, essentially a handful of emergency room visits, during which he primarily complained of the same symptoms as before. Plaintiff points to nothing specific in these records suggesting greater limitations. <u>See Lewis</u>, 2015 U.S. Dist. LEXIS 83666, at *17-18 (affirming where the ALJ considered the subsequent evidence, and the claimant failed to explain what in that evidence could cast doubt on the consultants' opinions); <u>Cain-Wesa v. Astrue</u>, No. 11-C-1063, 2012 U.S. Dist. LEXIS 81699, at *59-60 (E.D. Wis. June 13, 2012) (affirming reliance on consultant's report where claimant pointed to no later evidence that might change the outcome). The cardiac issues noted in February 2014 appear to be new, but as the ALJ noted, testing ruled out acute coronary syndrome, the symptoms resolved with treatment, and plaintiff was discharged with a diagnosis of drug-induced atrial fibrillation. The ALJ accordingly found plaintiff's cardiovascular impairments non-severe. (Tr. at 37.) Plaintiff does not argue that the ALJ erred in this regard. Nor does he offer more than speculation that the cardiac issues, although non-severe, would have combined with his other impairments to reduce the RFC to less than sedentary.

The ALJ considered the entire record, not just the consultants' reports, in setting RFC, as he was required to do. Because the evidence was sufficient for the ALJ to find plaintiff not disabled, he was not required to re-contact the medical experts. <u>See Skarbek v. Barnhart</u>, 390

_____

exactly what the ALJ is supposed to do. <u>Kepple v. Massanari</u>, 268 F.3d 513, 516 (7th Cir. 2001); <u>see also Olsen v. Colvin</u>, 551 Fed. Appx. 868, 874 (7th Cir. 2014) ("The cases in which we have concluded that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment.").

F.3d 500, 504 (7th Cir. 2004).

**2. Sleep Apnea**

The ALJ determined at step two that plaintiff's sleep apnea did not constitute a severe impairment. Plaintiff does not contest this finding but rather argues that the ALJ failed to explain how he considered the limiting effects of this impairment in assessing RFC. See Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe[.]"); see also SSR 02-1p, 2002 SSR LEXIS 1, at *6-7 ("Obesity increases the risk of developing impairments such as . . . sleep apnea. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea."). In support of such limitations, plaintiff points to his own testimony that he frequently awoke in the middle of the night with a racing heartbeat, that he never awoke feeling refreshed, and that as a result he lied down and napped during the day. Plaintiff further notes the medical records indicating that he suffered from moderate obstructive sleep apnea, as well as extreme obesity; that doctors were unable to properly titrate his CPAP machine; and that he was unable to afford follow-up care for sleep apnea. He faults the ALJ for failing to explain why the combination of obesity and uncontrolled sleep apnea did not produce work-related limitations, failing to cite evidence that these conditions did not cause the limitations he alleged (e.g., needing to nap during the day), and failing to explain how he could maintain focus at work. See Myles v. Astrue, 582 F.3d 672, 676-77 (7th Cir. 2009) (reversing where ALJ failed to properly analyze claim of fatigue). Plaintiff concludes that this error cannot be dismissed as harmless, given the VE's testimony that a person who needed to lie during the day, as plaintiff alleged, could not sustain competitive employment.

29

While it the ALJ's duty to determine RFC based on all of the claimant's impairments, severe and non-severe, it is the claimant's burden to demonstrate that his impairments cause work-related limitations.  See Mueller v. Colvin, 524 Fed Appx. 282, 286 (7th Cir. 2013); Hernandez v. Astrue, 277 Fed. Appx. 617, 624 (7th Cir. 2008).  The ALJ considered the medical evidence related to plaintiff's sleep apnea, including the evidence that plaintiff could not afford follow up care, but noted that examiners did not observe associated symptoms that would limit plaintiff's ability to work.  Plaintiff fails to point to any medical evidence supporting such limitations,[22] and the ALJ considered and discounted plaintiff's statements regarding his alleged limitations, as will be discussed below.

### 3.     Dr. Gilson's Report

Plaintiff next argues that the ALJ erred in rejecting Dr. Gilson's opinion of significant limitations in standing, walking, sitting, lifting, grasping, and concentrating.  The opinion of a claimant's treating physician will, if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record, receive "controlling weight."  20 C.F.R. § 404.1527(c)(2).  If the opinion does not meet the test for controlling weight, the ALJ must determine how much weight the opinion does deserve, considering the length, nature, and extent of the treatment relationship; frequency of

---

[22]In reply, plaintiff notes medical records stating that his "sleep efficiency was 53%" (Tr. at 459), and that he had "insomnia with sleep apnea" (Tr. at 278).  A mere diagnosis does not establish functional limitations or an inability to work.  Allen v. Astrue, No. 10 C 994, 2011 U.S. Dist. LEXIS 84884, at *35 (N.D. Ill. Aug. 1, 2011); see also Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005).  Plaintiff contends that medical evidence is not required to show that a person who does not sleep well will be tired the next day, and that his own testimony that he needed to lie down during the day is sufficient evidence of the impact of his sleep apnea.  As discussed in the text, the ALJ considered and discounted plaintiff's testimony.  I address later in this decision plaintiff's contention that the ALJ erred in considering the testimony.

30

examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion.  Scott v. Astrue, 647 F.3d 734 , 740 (7th Cir. 2011). The ALJ must always provide "good reasons" for discounting the opinion of a treating physician.  Id. at 739.

Plaintiff argues that the ALJ failed to weigh Dr. Gilson's opinion according to the regulatory factors, but the ALJ's decision generally covered the checklist.[23]  The ALJ discussed the treatment relationship, noting that plaintiff saw Dr. Gilson in 2012 but that plaintiff did not consistently follow up with Dr. Gilson thereafter; Dr. Gilson's report was dated March 2014.  (Tr. at 39, 42.)  The ALJ also discussed plaintiff's MRI scan and the inconsistency of Dr. Gilson's diagnosis of spinal stenosis with that scan.   The ALJ further found Dr. Gilson's opinions inconsistent with the doctor's own observations and findings, with the observations and findings of other examiners, with plaintiff's conservative course of treatment, and with the recommendations of other providers that plaintiff increase his activity level (which suggested greater abilities than Dr. Gilson put forth).  (Tr. at 42.)

Plaintiff complains that the ALJ did not explain how Dr. Gilson's findings contradicted the report, failed to mention certain exam findings (e.g., edema, tenderness to palpation), and failed to discuss Dr. Gilson's treatment for a variety of other impairments (e.g., sleep apnea,

---

[23]Plaintiff contends that the ALJ did not acknowledge that Dr. Gilson was a treating source, whose report was entitled to special consideration.  While the ALJ did not explicitly state that Dr. Gilson was a treating source, he did discuss the treatment Dr. Gilson provided, and he particularly considered Dr. Gilson's report consistent with the checklist factors.  Plaintiff fails to show any harmful error in this regard.  See Mays v. Colvin, 739 F.3d 569, 575 (10th Cir. 2014) (declining to reverse where ALJ did not expressly state whether he had given treating source opinion "controlling weight" but implicitly declined to do so).  As discussed in the text, the explanation given by the ALJ for discounting Dr. Gilson's opinion in this case is sufficient to allow me to trace the path of his reasoning.  See Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995).

31

hypertension, edema, gout). Earlier in his decision, the ALJ specifically discussed the results of Dr. Gilson's January 2012 examination, including flexion without back or leg pain, intact gait, and intact coordination (Tr. at 39), findings which appear to contradict the extreme limitations in the March 2014 report. The court reads the ALJ's decision as a whole and may consider these other portions of the opinion in determining its sufficiency. See Summers v. Colvin, 634 Fed. Appx. 590, 593 (7th Cir. 2015) (citing Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004)). The ALJ was not required to repeat these observations in explaining the weight he gave the report. See Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). Nor was the ALJ required to discuss in writing each finding Dr. Gilson made and each condition for which he treated plaintiff. See id. at 650-51.[24]

Plaintiff notes that Dr. Gilson also based his opinions on the findings of Dr. Maiman. The ALJ discussed Dr. Maiman's findings – unremarkable motor examination, mildly anatalgic gait, and decreased lumbar range of motion. (Tr. at 39.) The ALJ also discussed Dr. Maiman's strong recommendation that plaintiff lose weight, start a rehabilitation program, and maintain or resume normal activities ASAP. Dr. Maiman specifically advised against bed-rest. (Tr. at 39, 295-96.) The ALJ found that while Dr. Maiman's findings supported some limitations, they also supported a finding that plaintiff could do more than Dr. Gilson indicated.

Plaintiff contends that the ALJ failed to identify the other examiners whose findings were supposedly inconsistent with Dr. Gilson's report. Again, plaintiff fails to read the decision as a whole. Earlier in the opinion, the ALJ discussed the findings of Dr. Maiman, as indicated

---

[24]The ALJ did not impermissibly make his own independent medical findings in comparing Dr. Gilson's treatment notes with the report, as plaintiff alleges in reply. The ALJ may discount a doctor's report if it is inconsistent with observations in the doctor's own treatment notes. E.g., Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).

above; PA Behar, who in October 2011, shortly after the alleged disability onset date, found plaintiff non-tender to palpation with the exception of the bilateral calves (Tr. at 39, 279); the ER doctors who saw plaintiff in November 2011, noting normal range of motion and normal gait (Tr. at 39, 392-93); physical therapist Kennedy, who in February 2012 noted only mild difficulty transitioning from sitting to standing and mildly antalgic gait (Tr. at 39-40, 317); the ER doctors who saw plaintiff in June 2013, noting normal range of motion (Tr. at 40, 470); the ER doctors who saw him in January 2014, noting normal gait, normal coordination, and normal reflexes (Tr. at 40, 795); and the ER doctors who saw him in February 2014, noting normal range of motion with no edema and no tenderness (Tr. at 40, 551). The ALJ did not, as plaintiff alleges, rely solely on the opinions of the state agency consultants.[25]

Plaintiff notes that while the MRI report did not list spinal stenosis, which is defined as "a narrowing of the open spaces within [the] spine,"[26] it did list "canal narrowing." (Tr. at 308.) Plaintiff contends that if the ALJ did not understand how Dr. Gilson interpreted the MRI, he should have re-contacted Dr. Gilson, rather than relying on his own lay medical opinion to find an inconsistency. But the ALJ did not rely on his own interpretation of raw medical data; rather, he cited the impressions of Dr. Andrew Klein based on the scan. (Tr. at 39, citing Tr. at 334.) Plaintiff complains that the ALJ failed to explain how this single diagnosis nullified Dr. Gilson's entire opinion, which was also based on polyarthritis and epidural lipomatosis. The ALJ did not say this (mis)diagnosis defeated the entire opinion; he cited it as one factor against the

---

[25]Nor did the ALJ, in reviewing this evidence, improperly interpret raw medical data, as plaintiff claims in reply. Rather, he relied on the specific observations of the doctors that plaintiff retained normal range of motion, gait, etc.

[26]http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105.

33

credibility of the report. The regulations specifically require the ALJ to consider the consistency of a doctor's opinion with the other evidence, including the medical testing.[27]

Plaintiff faults the ALJ for relying on his conservative treatment without identifying what more aggressive treatment was available and appropriate to address his impairments. Again, this was but one factor in the ALJ's analysis, consistent with the checklist. Plaintiff also appears to misunderstand the basis for this observation. The ALJ concluded, based on the medical evidence, that plaintiff's impairments were such that no more than conservative measures were needed to treat them; the ALJ did not say that plaintiff's functioning could be restored via treatment plaintiff refused without cause to obtain.

Finally, plaintiff argues that Dr. Gilson's report, which specifically evaluated his ability to perform work tasks, was not inconsistent with the recommendations from other providers that plaintiff increase his activity level. Plaintiff contends that Dr. Gilson did not opine that plaintiff was completely incapable of performing all activity; he merely opined that plaintiff retained minimal capacity to perform work tasks. It was not unreasonable for the ALJ to find Dr. Gilson's extreme limitations – including standing and walking for just 0.1 hours in an eight hour day, never lifting any amount of weight, and never working above the shoulder, bending, twisting or turning (Tr. at 42, 539-40) – inconsistent with the recommendations that plaintiff start a rehabilitation program, maintain or resume normal activities ASAP, and avoid bed-rest (Tr. at 295-96). The ALJ did not say that the recommendation for exercise meant that plaintiff could also work full-time. See Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004) (reversing

_____

[27]Plaintiff notes in reply that Dr. Klein did not translate his impressions into functional limitations. The ALJ did not say he did. As discussed in the text, the ALJ simply cited the inconsistency between Dr. Gilson's report and the MRI as one reason for giving the report limited weight.

where ALJ equated therapeutic exercise with demands of full-time work).  Rather, he found the recommendation of increased activity inconsistent with Dr. Gilson's opinion that plaintiff could do very little.  See Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (finding medical recommendation to increase physical exercise inconsistent with disabling physical limitation).

### 4.    Sitting

Plaintiff next argues that the ALJ erred in determining that he retained the ability to sit as required for the full range of sedentary work, i.e., six hours in an eight hour day, see SSR 83-10, 1983 SSR LEXIS 30, at *13, and that he did not require a sit-stand option, based in part on his ability to sit through the hearing.  (Tr. at 41.)  Plaintiff contends that the ALJ failed to explain how his ability to sit through an hour-long hearing, with some shifting in his chair, translated into an ability to sit as required for sedentary work.  He notes that impairments of the lumbar spine, when combined with obesity, can restrict a claimant's ability to sit.  See, e.g., Liggins v. Colvin, 593 Fed. Appx. 564, 568 (7th Cir. 2015).  Finally, he faults the ALJ for failing to include in his hypothetical questions to the VE plaintiff's need to shift in his seat to relieve discomfort or how often he would need to shift.  See O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2000) ("Our cases generally have required the ALJ to orient the VE to the totality of a claimant's limitations.").

Courts are skeptical of the so-called "sit and squirm" test, under which a claimant's allegations are evaluated based on whether he appears uncomfortable during the hearing, although the ALJ's observations of the claimant may play a role.  See, e.g., Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000).  Here, the ALJ did not base his finding solely on his observation of plaintiff at the hearing.  He also considered the observations of examiners, the

35

objective medical evidence, and plaintiff's activities of daily living (Tr. at 41), consistent with the factors set forth in SSR 96-7p, 1996 SSR LEXIS 4, at *8. That the ALJ did not give undue weight to plaintiff's presentation at the hearing is confirmed by his statement that plaintiff's "ability to sit through the hearing is <u>added</u> evidence that he does not require a sit-stand option." (Tr. at 41, emphasis added.) Further, the ALJ did not find that plaintiff's ability to sit through the one-hour hearing meant he could sit for six hours as required for sedentary work, as plaintiff contends in his reply brief. The ALJ considered plaintiff's presentation at the hearing in assessing the need for a sit-stand option.

In any event, the ALJ found that even if plaintiff did need to change positions from sitting to standing for a few minutes at a time, in addition to usual breaks, he still would not qualify as disabled. (Tr. at 43.) At the hearing, the ALJ asked the VE a hypothetical question including this limitation, and the VE responded that such a person could still perform a variety of jobs. (Tr. at 44, 91.) Plaintiff fails to address this alternate basis for denial of his claim.

Finally, the ALJ considered the effect of plaintiff's obesity on his ability to work. (Tr. at 36.)[28] Plaintiff identifies no medical evidence, overlooked by the ALJ, supporting greater limitations. <u>See</u> SSR 02-1p, 2002 SSR LEXIS 1, at *15 (indicating that weight gain alone does not evidence impaired functionality, and that ALJ should not make assumptions about the severity or functional effects of obesity).

---

[28]As plaintiff notes in reply, the ALJ discussed obesity at step two and did not repeat that analysis in determining RFC. Because I read the decision as a whole, that was not required. <u>See</u> <u>Curvin</u>, 778 F.3d at 650.

36

### 5.    Credibility

Plaintiff's last argument is that the ALJ failed to analyze the credibility of his allegations with a sufficient level of detail.  As indicated above, the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (Tr. at 39.)  The Seventh Circuit has criticized the phrase "not entirely credible" as "meaningless boilerplate."  Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010).  However, the ALJ went on to provide more specific reasons for his finding here, considering the medical evidence, plaintiff's daily activities, plaintiff's appearance at the hearing, and plaintiff's previous statement that he needed to go back to school and learn a job that would not require him to walk during the day.  See, e.g., Summers, 634 Fed. Appx. at 591-92 (finding the boilerplate harmless where the decision otherwise explained the adverse credibility finding).

Plaintiff contends that the ALJ failed to specify which statements were credible and which were not, but that is not required.  Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012) (holding that "an ALJ's credibility findings need not specify which statements were not credible").  Nor is an ALJ required to specifically address each and every allegation the claimant makes.  See id.

Plaintiff argues that the ALJ erred by relying on his own lay interpretation of the medical evidence in evaluating credibility, but that is not so.  The ALJ cited Dr. Klein's impression that the MRI showed "mild epidural lipomatosis, mild degenerative disc disease at L4-L5 and no abnormal signal in the distal cord."  (Tr. at 39, citing Tr. at 334, emphasis added.)  The ALJ reasonably concluded that these "mild" findings did not support a claim of disabling limitations. See Olsen, 551 Fed. Appx. at 874-75 (rejecting argument that ALJ "played doctor" in finding

37

that MRI showed only mild impairment). The ALJ further found the contemporaneous observations by providers of intact gait, intact coordination, and retained range of motion inconsistent with plaintiff's claim that he could not perform even sedentary work.[29]

Plaintiff argues that the ALJ erred in relying on the recommendation that he increase his level of activity as evidence that he was not as limited as alleged. Plaintiff indicates that, while this recommendation was made, no treating physician opined that he could resume full-time work; he also again notes that therapeutic exercise should not be confused with full-time work. As discussed above, the ALJ did not equate exercise (or plaintiff's other activities) with full-time work. Rather, he found this evidence inconsistent with the specific limitations alleged by plaintiff and Dr. Gilson. See Gleason v. Colvin, No. 13-C-1378, 2015 U.S. Dist. LEXIS 70494, at *65 (E.D. May 29, 2015) (affirming where the ALJ did not equate the claimant's activities with full-time work but rather contrasted them with plaintiff's claims of disabling pain and other limitations).[30]

Finally, plaintiff argues that the ALJ erred in finding that his ability to move boxes

---

[29]As plaintiff notes in reply, the ALJ may not reject a claimant's statements based solely on a lack of corroborating objective medical evidence. But this does not mean "that an ALJ can never consider the lack of objective evidence in rejecting a claimant's subjective complaints." Simila v. Astrue, 573 F.3d 503, 519 (7th Cir. 2009). Indeed, the regulations specifically require the ALJ to consider the objective medical evidence as part of his analysis. Id. (citing 20 C.F.R. § 404.1529(c)). Here, as in Simila, "the ALJ considered the objective evidence along with a host of other factors named in the regulations." Id. Plaintiff also argues in reply that the ALJ erred by relying on his conservative treatment without discussing what treatment was available and appropriate, and why plaintiff did not seek it (e,g, lack of insurance/funds). But this is not a case where the ALJ found plaintiff incredible based on non-compliance with treatment; rather, he found that no more than conservative treatment was necessary to treat plaintiff's impairments. This was a proper consideration. See id. (affirming ALJ's consideration of claimant's relatively conservative treatment history).

[30]Perhaps the ALJ could have more thoroughly explained his conclusion that plaintiff's limited activities "appear volitional." (Tr. at 41.) This alone does not require remand.

38

suggested that his symptoms were not as disabling as alleged. Plaintiff ended up in the emergency room with a flare of back pain after he engaged in this activity (Tr. at 40, 255), so it likely does not say much about his ability to sustain full-time work. See Scrogham v. Colvin, 765 F.3d 685, 700 (7th Cir. 2014) (rejecting reliance on activity that precipitated doctor's visit and noting that "this type of ill-advised activity cannot support a conclusion that Mr. Scrogham was capable of performing full-time work"). But any error in relying on this evidence was harmless, as the ALJ provided several other reasons for his credibility finding. Moreover, the ALJ limited plaintiff to sedentary work, which requires little lifting; the ALJ did not rely on plaintiff's lifting of boxes to find that he could perform more strenuous work.

For all of these reasons, I cannot find the ALJ's credibility determination "patently wrong." See Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong, and deserving of reversal.") (internal citation and quote marks omitted).

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of August, 2016.

/s Lynn Adelman
LYNN ADELMAN
District Judge

39